164 NEBRASKA REPORTS. [VOL. 88

In re Application of Metz Bros. Brewing Co.

IN RE APPLICATION OF METZ BROTHERS BREWING COM-
PANY FOR LIQUOR LICENSE.

J. M. LEIDY, APPELLANT, V. METZ BROTHERS BREWING
COMPANY, APPELLEE.

FILED JANUARY 9, 1911. No. 16,533.

1. **Intoxicating Liquors:** SALES AT RETAIL. A manufacturer of beer
who sells his product to unlicensed consumers for their use sells
at retail within the meaning of chapter 82, laws 1907.

2. ———: ———: LICENSE. A manufacturer of beer who sells his
product at retail is guilty of selling beer without a license, and,
that fact being made to appear, an excise board should not issue
a license to him in the year next succeeding the commission of
that offense.

APPEAL from the district court for Douglas county:
LEE ESTELLE, JUDGE. *Reversed with directions.*

*L. D. Holmes, Elmer E. Thomas* and *W. R. Patrick*, for
appellant.

*Myron L. Learned, contra.*

*John C. Cowin* and *John P. Breen, amici curiæ.*

REESE, C. J.

In December, 1909, Metz Brothers Brewing Company,
a corporation, applied to the board of fire and police
commissioners of the city of Omaha for license to sell at
wholesale malt, spirituous, and vinous liquors during the
license year commencing January 1, 1910. A re-
monstrance was filed alleging, among other things, that
the applicant had sold malt liquors, to wit, beer, at retail
during 1909. The board overruled the remonstrance and
granted the license. An appeal was prosecuted forthwith
to the district court for Douglas county and the judge
presiding held that the applicant had been guilty of selling
beer at retail as charged by the remonstrant, but that the

"Slocumb law" did not apply to such conduct, and the ruling of the board was confirmed. The remonstrant has appealed to this court.

The only witness produced before the board was Mr. Charles Metz, president of the corporation. His testimony is frank and unequivocal. It appears that in 1864 Metz & Brother, a partnership, were engaged in brewing beer in Omaha, and continued until the formation of the plaintiff corporation in 1894, and from the last named date until the present time said business had been conducted by the corporation. In 1909 the corporation was licensed to sell at wholesale intoxicating and malt liquors. During all of that year the licensee sold large quantities of beer to consumers; all of the liquor thus sold was placed in quart or pint bottles, which were sealed and thereafter packed in cases containing two dozen bottles. The boxes were securely fastened, and purchasers were not permitted to open a case or drink beer while upon the applicant's premises. The applicant and its predecessor in business sold beer to consumers in like manner for 15 years last past. The applicant does not solicit orders, but fills them whether received directly from purchasers or through the agency of the mail or telephone, and the greater part of case beer is sold direct to consumers. No discrimination is made in the price per case charged for beer between the smallest and largest order received. Before applicant's license was issued in 1909, the attorney for the board of fire and police commissioners prepared a written opinion advising the board that a brewer could not lawfully sell beer according to the course of business pursued by the applicant, and Metz Brothers Brewing Company was given, or procured, a copy of that opinion.

Counsel for the respective parties present the case in a double aspect. The applicant's counsel contends that the learned district judge erred in holding that Metz Brothers Brewing Company sold any beer at retail within the meaning of the "Gibson law," but that in any event a violation of that act should not disqualify a manufacturer

from receiving a license to manufacture beer and to sell it at wholesale. The remonstrant's counsel argue that the district judge's finding is correct, but his conclusion is unsound.

The traffic in intoxicating liquors is subject to such restraints and regulations as the legislature may prescribe. *State v. Hardy*, 7 Neb. 377; *Hunzinger v. State*, 39 Neb. 653; *In re Phillips*, 82 Neb. 45. Prior legislative enactments passed for the purpose of regulating and restricting that traffic were merged in the "Slocumb law" (laws 1881, ch. 61; Ann. St. 1909, ch. 32, sec. 7150 *et seq.*). The "Gibson law" (laws 1907, ch. 82) is supplemental to chapter 61, laws 1881. The act of 1907 has no independent title, but when enacted became a part of the Slocumb law as fully as though it had been originally written in the text of the earlier acts. *Rohrer v. Hastings Brewing Co.*, 83 Neb. 111. A corporation cannot qualify as a retail dealer in intoxicating or malt liquors. *Rohrer v. Hastings Brewing Co., supra*. By the terms of the Gibson act it is made unlawful for any person, natural or corporate, engaged in the manufacture of malt, spirituous or vinous liquors, to become interested directly or indirectly in any retail license for the sale of intoxicating or malt liquors, or to in any manner assist any retail dealer to procure such a license, or to lease premises for the use of such a retail dealer. Section 3 of the act (laws 1907, ch. 82) provides: "No liquor license issued to any person or corporation engaged as a manufacturer, wholesaler or jobber of malt, spirituous or vinous liquors shall entitle the holder thereof to engage, or in any manner to become interested, under pretext or otherwise, in the retail traffic in such liquors in this state." Within seven days after the Gibson act became effective, this court, in an opinion filed in the case of *In re Reusch*, 79 Neb. 449, stated: "We think that the intention of the legislature in the passage of sections 1, 2, 3 and 5 of the act assailed (laws 1907, ch. 82) was to prevent manufacturers, wholesalers or jobbers of intoxicating liquors, or their agents, from selling or being

interested in the sale of intoxicating liquors at retail."
With this settled construction of the law, it becomes
necessary to ascertain whether the applicant did, within
the meaning of the statute, sell beer at retail in 1909.

The liquor traffic has frequently been classified for
revenue and license purposes by acts of parliament and
congressional and legislative enactments, and quantity
has generally been the factor differentiating a wholesale
from a retail sale.  The fact that no such standard was
adopted in the Gibson act is good evidence that some other
element controls, one so well known that neither the per-
sons engaged in the traffic, nor the officers charged with
the enforcement of the law, should have any difficulty in
understanding the test and making the application.
Wholesale dealers as a rule sell only to merchants who
buy to sell to the consumer, whereas retail dealers sell
direct to the consumer, and not to other retail merchants.

The definition of the word "retail," as should be applied
to sales as given in Webster's New International Diction-
ary, is:  "To sell in small quantities, as by the single
yard, pound, gallon, etc.; to sell directly to the consumer;"
and in the Standard Dictionary:  "To sell in small quan-
tities, such as are immediately called for by consumers."
If the contention of applicant is to prevail, the manufac-
turer can inclose two pints in a sealed package as easily
as twenty-four and deliver to consumers, and thus practi-
cally nullify the provisions of our liquor laws and peddle
his product throughout the city and country.

In *State v. Scampini,* 77 Vt. 92, the court considered
the proper construction to be given the words "wholesale"
and "retail" as applied to the liquor traffic.  In that case,
as in the one at bar, the statute to be construed did not
classify according to the amount of liquor sold at any one
time.  The court held in the Vermont case that sales by
wholesale are only those sold to persons having a license
to sell direct to the consumer for consumption.  The
opinion cites with approval the definition given by Bacon,
V. C., in *Treacher & Co. v. Treacher,* W. N. (1874, Eng.) 4,

which is as follows: "As a general rule 'wholesale' merchants dealt only with persons who bought to sell again, whilst 'retail' merchants dealt with consumers." The same definition is given to the words in 3 Stroud, Judicial Dictionary (2d ed.) p. 2237, and in 12 Ency. Laws of Eng. 587. The same distinction is made in classifying the liquor traffic in *State v. Lowenhaught,* 11 Lea (Tenn.) 13. Counsel for the applicant criticises the case last cited, and correctly argues that the statement is dictum as applied to the record in that case. But the Tennessee court adopt the same classification in *State v. Tarver,* 11 Lea (Tenn.) 658, where the question is necessarily involved in the decision made, and the court say: "That the distinction between a wholesale and retail dealer did not depend upon the quantity sold by either, but that sales to purchasers of packages or quantities for the purposes of trade or being resold, constituted a wholesale dealer; and sales to persons or customers for purposes of consumption constituted a retail dealer." See, also, *Webb v. Baird,* 11 Lea (Tenn.) 667. The question is considered and the question re-examined by the Tennessee court in *Harrison v. State,* 96 Tenn. 548, and the same conclusion reached that was attained in *State v. Tarver, supra.* The rule announced in the Vermont case and in the Tennessee cases is practical and unerring in its application. The limit which nature has placed upon the consumption of strong drinks by an individual will practically limit all sales to unlicensed consumers to purchases of a retail character. The mere fact that the applicant has engaged in the retail traffic for years will not work a repeal of a law enacted three years since, to prevent it, in common with all other manufacturers, from engaging in that business. The "original package" theory presented as a defense to sales of bottled beer by the case does not apply. The legislature has not said that a sale by wholesalers of their commodity in original packages shall not constitute a sale at retail. Should the law be so construed, every manufacturer and wholesaler might engage in the retail traffic, subject only

**VOL. 88]**     **JANUARY TERM, 1911.**     **169**

In re Application of Metz Bros. Brewing Co.

to their inability to sell by the drink. To adopt any standard other than the one we have suggested, in classifying the liquor traffic for the purposes of the liquor laws of this state, will involve the entire subject in doubt and uncertainty, and eventually will emasculate a highly remedial statute. The finding of the district judge that the sales were made at retail is sustained by the law and the evidence. See *State v. Spence*, 53 So. (La.) 596.

The conclusion announced that such a violation of law presents no bar to the granting of a wholesaler's license cannot be upheld. If a wholesaler sells at retail, he is in the plight of one who sells without a license, because his license affords no protection as against a prosecution. *Adams v. Hackett*, 27 N. H. 289; *Gersteman v. State*, 35 Tex. Cr. Rep. 318; *Pearson v. International Distillery*, 72 Ia. 348; *Rohrer v. Hastings Brewing Co.*, 83 Neb. 111. The applicant, therefore, during the year 1909 violated section 11 of the Slocumb law (laws 1881, ch. 61; Ann. St. 1909, ch. 32, sec. 7161) and license should not have been granted it for the current year.

The judgment of the district court, therefore, is reversed and the cause remanded, with instructions to cancel the license issued to the applicant.

                               REVERSED.

BARNES, FAWCETT and SEDGWICK, JJ., dissenting.

We are unable to concur in the majority opinion. The reasons for our dissent, briefly stated, are as follows: The opinion holds that the sale by a brewer of sealed cases, containing 24 quart or pint bottles of beer, to one not a licensed retailer of intoxicating liquors is a sale at retail, and a violation of the statutes regulating the sale of intoxicating liquors regardless of conditions or price. It defines the terms wholesale and retail in a manner quite at variance with the generally adopted meaning of those words when applied to the sale of other commodities. The statement of facts contained in the majority opinion wholly eliminates the question of price, which ought to be

stated and considered in order to correctly decide the main question presented for our determination. It is agreed by the parties to this controversy that the Metz Brothers Brewing Company is solely a manufacturer of beer, and that its business has been conducted by it and its predecessor in the city of Omaha for more than 30 years; that during all of that time it has been disposing of its product in the following manner: That in 1909 the defendant had a wholesale license, but no license to do a retail business. During that year, as in all preceding years, it sold beer directly to individuals for their own use or own consumption, delivering it at the homes of citizens of Omaha, and shipping it to parties outside of the city in cases containing not less than two dozen bottles; some of the cases holding two dozen pint bottles and others two dozen quart bottles. The cases are made of wood with a hinged lid and catch. After a case is filled the lid is fastened down and sealed by putting a wire through the catch and fastening it so that no one can open the case except by breaking the seal or box. The defendant does not manufacture anything except beer, and does not handle liquors of any other description. It sold no beer in bottles to any one, either at the brewery or elsewhere, during 1909, except in cases containing the number of bottles above mentioned. No one can buy beer from the defendant by the glass, or any number of bottles less than a full case. The cases described are the original packages in which the beer is put up at the brewery, and the same kind of cases are sold to all, whether saloon-keepers for resale or individuals for home consumption. The retail price of the pints is 15 cents a bottle, and the quarts 25 cents a bottle. The price charged by the defendant for a case of pints is only $1.30, and for a case of quarts $2.25. The price is the same to all, and the question is not asked whether the case is for resale or for home consumption. It appears that only about 2 per cent of the bottled beer sold for home consumption is sold by saloons. There is no personal solicitation of orders for

beer. The orders for cases of beer come over the telephone and by mail, the former generally from citizens of Omaha, and the latter from persons outside of the city. Defendant keeps teams for the purpose of delivering its beer, but, so far as the evidence shows, saloon-keepers do not so deliver the beer sold by them. No purchaser of a case of beer at the brewery is ever permitted to open it and drink any of the beer on the premises. Defendant has never sold beer by the glass or the single bottle, or in any other manner than in the original packages above described. During the 30 years defendant and its predecessor have been in business its beer has been sold for home consumption in unbroken packages, the cases being of the same kind and size as sold to the saloon-keepers, either in or outside of Omaha. In many instances it is impossible to know whether an order is given by one who is a saloon-keeper or not. The percentage of beer which the defendant sells in original cases for home consumption is about 10 per cent. of its total output, the remaining 90 per cent. being sold to retail dealers. Former police boards, and the authorities of the city of Omaha, have been aware of the practice of the defendant in selling its beer in such unbroken packages for home consumption during all of the time it has been in business. Defendant's beer is made in Omaha, Nebraska, and the sales referred to in this case were made in that city to parties residing in the state, and in some instances to parties residing outside of the state. The beer is delivered either to residences or to saloons indiscriminately, and the same price is charged to all.

To our minds, the sales above described are sales at wholesale, and not at retail as held by the majority opinion. The Century Dictionary defines the word "wholesale" as follows: "Sale of goods by the piece or in large quantity, as distinguished from *retail*. * * * In the mass; in the gross; in great quantities; hence, without due discrimination or distinction;" and the word "retail" is defined as "a piece cut off; * * * a shred, rem-

nant;   *   *   *   The sale of commodities in small quantities or parcels, or at second-hand; a dealing out in small portions; opposed to *wholesale.*   *   *   *   In small quantities; a little at a time.   *   *   *   To sell in small quantities or parcels.   *   *   *   To sell at second-hand." And a "retailer" is defined as "one who sells or deals out goods in small parcels, or at second-hand." In *State v. Hawkins,* 91 N. Car. 626, it was said: "To *retail* means, generally, to sell by small quantities, in broken parts, in small lots or parcels, not in bulk." In *Bridges v. State,* 37 Ark. 224, the court said: "Alcohol is embraced in any one of the terms, *goods, wares* or *merchandise.* To sell by small parcels or quantities, and not in the gross, is *to retail.*" In *Tripp v. Hennessy,* 10 R. I. 129, it appears that the police officers purchased from Hennessy ten gallons of whiskey, which he drew from a cask containing a much larger quantity. The question presented was whether this was a sale at wholesale or retail. It was held that the word "wholesale" was used in the statutes in its common and popular sense. The court said: "The sale here involves the idea of breaking up, and dividing, and parceling out the goods which are held by the seller in larger parcels or packages in which he has purchased, and excludes the idea of selling a thing whole and unbroken." We think the court there announced the correct idea as to the distinction between wholesale and retail. Again, that question is not to be determined alone by the quantity, but by the quantity, the conditions, and the price. In that case there was a sale of ten gallons of whiskey, yet it was held that it was a sale at retail, because it was a sale of the broken portions of the original package. If the ten gallons of whiskey had been in H.'s place of business in the original package and he had sold it to the police officers, from the language of the court there could be no question but what it would have been held to be a sale at wholesale. For example, a manufacturer or a wholesale grocer sells a retailer a case containing two dozen cans of peaches at his wholesale price. No one will

contend that such a sale is not at wholesale.    The retailer
opens the case and sells a customer one can or a half dozen
cans.    That is a sale at retail.    The brewer sells a case
or two dozen bottles of beer direct to the saloon-keeper.
That is conceded by the majority opinion to be a sale at
wholesale.    The saloon-keeper breaks the seal, opens the
case, and sells a single bottle or a half dozen bottles to
the consumer.    That must be conceded to be a sale at re-
tail.    The difference therefore is that in the one case it is
sold as a whole or original package for a wholesale price,
while in the other the original package is broken up and
the contents sold in smaller quantities to suit the con-
sumer at a retail price, yet, according to the majority
opinion, if the defendant received from both A and B, at
the same hour, telephone orders for a case of beer each,
the sale to A, if he were a saloon-keeper, would be at
wholesale, and the sale to B, if he were not a licensed
retail dealer in intoxicating liquors, would be at retail.
We are utterly unable to concur either in the logic or the
conclusion of this opinion.

In *Haley v. State,* 42 Neb. 556, it appears that bottles
of intoxicating liquors were each enclosed in a paper
wrapper or box, which was sealed with sealing wax, and a
number of the paper boxes, each containing a flask of such
liquor, were packed in a wooden box by a party in St.
Louis, Missouri, and shipped to his agent at Republican
City, Nebraska, and the agent opened the wooden box,
took the paper boxes in which the flasks of liquor were
contained therefrom, and sold them separately.    This
court held that the wooden box, and not the sealed paper
box or wrapper and the bottle therein enclosed, was the
original package, and such sale was a violation of the
law of this state regulating the license and sale of malt,
spirituous and vinous liquors.    Under the reasoning in
that case the wooden cases in which the defendant is
selling its beer are the original packages, and we do not
think the selling of such original packages, considering
that they are sold at a wholesale price, is a sale of intoxi-

174          NEBRASKA REPORTS.          [VOL. 88

In re Application of Metz Bros. Brewing Co.

cating liquors at retail. In order to constitute a sale at retail, the original package must be broken up and its contents distributed or retailed to consumers. In our view of the matter, the word "retail" is very badly defined in the majority opinion. The tests by which to ascertain the meaning of that word, there set forth, are inadequate to explain the various meanings in which the word has been used in the different decisions of the courts, and in various business transactions. Its meaning is always to be determined from the context, from the circumstances under which it is used, and from the general scope, purpose and meaning of the article or provision in which it appears. It will not do to say that a sale to a consumer is a sale at retail, because consumers have the right to purchase at wholesale, and undoubtedly frequently do so. It will not do to say that a sale to one who has a license is a sale at wholesale, and to one who has no license is a sale at retail, because manifestly one who has a license may buy at retail, and one who has no license may purchase in wholesale lots. It will not do to say that the object of the Gibson law was to compel the manufacturer to deal with jobbers and retailers, because the spirit and intention of the Slocumb law, of which that law is a part, is to curb and restrict retailers and allow communities to expel them altogether, without preventing those individuals who insist upon their personal right to buy liquor from procuring it from the manufacturers and from using it themselves as they may see fit. It will not do to say that it is unlawful for the sellers of liquor, who are duly licensed, to deliver the articles that they sell. The statute will not bear such construction. It contains no provision upon that subject, except that section 5 of the original Slocumb law states that the license shall state the place where the liquor is being sold, and the form of the license prescribed leaves a blank for that purpose. This clearly is for the purpose of enabling the public to know where the business is located, and enable it to identify the responsible parties. It cannot be construed to mean

that the sales in all cases must be complete by delivery and payment at the particular building that is named in the license. To determine then the meaning of the word "retail" as it is used in the third section of the Gibson law, we must consider the whole act; the evil which existed at that time, which it was proposed to remedy, and the nature of the remedy adopted by the legislature. It is so notorious, and so much a matter of public interest, that courts may take notice that good citizens throughout the state were complaining of the method used by manufacturers and wholesalers of liquor through the instrumentalities of the public saloon. It is not, necessary to enumerate the evils that were supposed to originate from this unholy combination. The first section of the act forbids manufacturers to become interested in any liquor license for the retail sale of liquors. The second section prohibits manufacturers to assist in procuring a license for sale at retail. Section 3 provides that the license to a wholesaler shall not entitle him to engage in retail traffic in liquors. Section 4 prohibits him from constructing or renting any buildings, etc., in which to conduct "the retail sale" of liquors; and Section 5 forbids any person from soliciting or receiving from any person, trust or association as aforesaid, any assistance in procuring any license for the retail sale of liquors, and also forbids any person from leasing any building, etc., owned by any one engaged in the manufacture, or as a wholesaler of liquors, in which to conduct the retail trade. The act does not define what the legislature meant by the retail sale, nor what was meant by manufacture and jobbing. There is no direct provision in the act from which it can be determined when a man is a jobber or when he is engaged in the retail trade. Considering the evil that the legislature was seeking to remedy, the purpose that it had in view, and the remedy that it proposed to provide, it was wholly unnecessary to define retail and wholesale. The matter was thoroughly understood. The legislature was aiming at the manufacturer on the one side and the saloon on the

other, and everybody knew what that meant. They did not say that the manufacturer shall sell only at wholesale, and shall not sell at retail, but they used invariably the expression, "retail sale," meaning the retail business, as it was then known, to wit, the saloon business. The legislature followed up this purpose from every point. It forbade the manufacturer to assist the saloon-keeper to get a license; it forbade him to have any interest in licenses; it forbade him to own any interest in the saloon business; it forbade anybody that had stock in his company to own any interest in the saloon business, and it forbade the saloon-keeper to ask or to receive the assistance of the manufacturer in getting a license, or to let or use any building for saloon purposes that the manufacturer was in any way interested in. Through it all is the manifest purpose to divorce the manufacturers from the saloon business, and it seems clear to us that the legislature never intended to prohibit the manufacture and sale of beer entirely. The policy of the law plainly is to require those who insist upon buying intoxicating liquor as a personal privilege to take it directly from the manufacturer without encouraging saloons or jobbers, and to interfere as little as possible with those citizens who disapprove of the whole business. The fact that the legislature failed to define the words "wholesale" and "retail," we are told in the majority opinion, should require us to construe those words in a special or limited sense, and they should not be given their ordinary and commonly understood meaning. To our minds that fact presents the strongest reason for giving the words their generally understood and commonly accepted definition, and it seems clear that the legislature intended that this should be done.

Finally, for the courts to undertake to suppress the brewers of this state by the indirect method of refusing a license to carry on their business as a penalty for transacting it as they have done for 30 years with the acquiescence of the public, and without any statute directly

and plainly changing that custom, and without giving them, with their enormous capital, an opportunity to adjust themselves, their property and their business to new conditions, would be not only unjust and oppressive, but an invasion of the province of the legislature. We are of opinion that such an important change in the policy of the state should be made by direct and unequivocal legislation, and with reasonable opportunity to capital so invested to adjust itself to the changed conditions, and not by judicial declaration.

To our minds it seems clear that the district court was wrong in holding that the sales in question were retail sales; that its judgment, although based upon other premises, was right and should be affirmed.